IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NARESH MIRCHANDANI and CHERYELONA MIRCHANDANI | * |
| Plaintiffs, | |
| | * Civil Action No.: BPG-04-CV-1099 |
| vs. | |
| HOME DEPOT, U.S.A., INC., et al. | |
| | * |
| Defendants. | |

\* \* \* \* \* \* \* \* \* \*

# DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE REGARDING EXPERTS

Defendants Krause, Inc. ("Krause") and Home Depot, U.S.A., Inc. ("Home Depot"), by their undersigned counsel, submit this Reply memorandum in response to Plaintiffs' Memorandum in Opposition to Defendants' Motion in Limine Regarding Experts ("Plaintiffs' Memorandum").

Plaintiffs have failed to provide any reliable data to support the contention of their expert, Joseph Balser, that Multimatic ladders containing zinc locking bolts (as opposed to steel locking bolts) were susceptible to the disengagement of those zinc locking bolts leading to hinge failure and ladder collapse.  Dr. Balser has admitted that he has never seen or replicated such a disengagement of zinc locking bolts.  Furthermore, contrary to Dr. Balser's erroneous interpretation of results of testing conducted by Krause, there is no testing that supports the proposition that such disengagement of zinc locking bolts can occur, or ever has occurred, during normal ladder use.

### I. Dr. Balser's opinion that Multimatic ladders with zinc locking bolts disengage from their locked position during normal use causing ladder collapse is not supported by any testing.

Plaintiffs have offered no results of testing to support the proposition advanced by Dr. Balser that Multimatic ladders with zinc locking bolts collapse due to the disengagement of those locking bolts from their locked position during normal ladder use. Indeed, Dr. Balser acknowledges that he has "never replicated a collapse such as the one involved in this case in the field." See *Daubert* Affidavit of Joseph D. Balser, Ph.D. at 4 (attached as Exhibit 7 to Plaintiffs' Memorandum). Rather, Dr. Balser erroneously concludes that "vibration testing done by the manufacturer clearly showed that zinc locking bolts moved toward an unlocked position during the manufacturer's tests" and that this testing by Krause "is a field validation of the forces which caused the collapse of the ladder in this case." Id.

Dr. Balser does not contest that there is a scientifically valid method for testing his disengagement theory. However, he himself has not undertaken such testing. Rather, the sole scientific data he relies upon to support his position is his interpretation of the results of testing conducted by Krause. Other than his interpretation of the manufacturer's testing results, Dr. Balser has offered no empirical scientific data to support his theory that Multimatic ladders, such as that owned by Plaintiffs, were susceptible to collapse due to disengagement of the zinc locking bolts.

Not only has Dr. Balser not replicated a spontaneous disengagement of zinc locking bolts on a Multimatic ladder leading to ladder collapse, but he has not been able

to even predict or quantify the forces that would be necessary to induce such disengagement. As he stated in his deposition:

> "I have not been able to quantify [the forces]. Of course, I have neither been paid to nor do I have access to a large volume of ladders that would be required to run such a test."

See Transcript of August 25, 2006 Deposition of Dr. Balser at 81 (attached hereto as part of Exhibit A).

Nor does Dr. Balser possess any particular training, experience or expertise regarding the manufacture, design or safety of ladders. His knowledge regarding ladders, particularly articulating ladders, is principally derived from his litigation experience. After 1987, he no longer maintained a license as a Registered Professional Engineer and worked in a self-employed capacity. Id. at 51. His work with ladders was due to his extensive engagement in personal injury product liability cases, in which he typically testified on behalf of individual claimants. Id. at 48-51, 62 and Dr. Balser's C.V. included in Deposition Exhibit 2. He has frequently testified against Krause or Home Depot, as well as against other ladder manufacturers. Id. at 53-54, 59-62 and Dr. Balser's C.V. Since 1985, he has not once testified in trial or at deposition that a ladder accident resulting in personal injury was caused other than as the result of either a defect in the ladder or the negligence of the manufacturer. Id. at 59-61, 67.

Dr. Balser has never designed a ladder or component part of a ladder that was sold to the public. Id. at 63. He has never been issued a patent with respect to any ladders or component parts of a ladder. Id. at 63-64. He has never consulted with a ladder

3

manufacturer or retail seller of a ladder with respect to the design or manufacture of ladders.  Id. at 64.

Dr. Balser has never served on any committee, government agency, consumer advocacy group or other association whose focus was safety in the use of consumer products.  Id.  He has never served on any group whose focus was the establishment of standards for the design, manufacture or safety of consumer products.  Id.  He has never been a consultant for any government agency with respect to the design or safety of ladders.  Id. at 65.  He has never been a consultant to or worked for OSHA, the Consumer Products Safety Commission ("CPSC") or the American National Standards Institute ("ANSI").  Id.  Nor has he worked for or been a consultant to any state or federal government agency with respect to the setting of safety standards for consumer products.  Id. at 65.

Dr. Balser has never published any paper, article or book chapter that addressed the use, operation, design or safety of ladders.  Id. at 66.  He has never testified before any city, state or federal government body or committee concerning the safety of ladders or accidents caused by ladders.  Id.  He has never communicated with the CPSC, OSHA or ANSI regarding ladder accidents, ladder design or ladder safety.  Id. at 67.

The essence of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, including Rule 702 of the Federal Rules of Evidence, is that federal courts play an important "gate keeping" function in keeping unreliable scientific testimony away from juries.  Accordingly, even if an expert witness may be qualified by virtue of his or her education, training or experience, that opinion must be based upon some empirical evidence and reflect the product of reliable principles or methods in the

4

field of expertise as well as scientifically valid application of those principles and methods to the subject matter of the case.  See Rule 702.  An expert cannot simply rely upon his own personal conviction that his proffered testimony is sound without some objective empirical data or reliable testing to back up those opinions.  Under *Daubert*, testimony that a proffered opinion is valid because "I say so" is not acceptable.  In this case, Dr. Balser has not undertaken any scientific testing to verify whether or not the disengagement of zinc locking bolts that he claims is even possible.  Yet, he recognizes that scientific testing is available to confirm or refute his theory.

> As *Daubert*, *supra* at 593, emphasized:
>
>> Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier-of-fact will be whether it can be (and has been) tested.  'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'  *Green* 645.  See also C. Hempel, Philosophy of Natural Science 49 (1966) ('[The] statements constituting a scientific explanation must be capable of empirical test'); K. Popper, Conjectures and Refutations:  The Growth of Scientific Knowledge 37 (5th Ed. 1989) ('[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability') (emphasis deleted).

In *Stanczyk v. Black & Decker, Inc.*, 836 F.Supp. 565, 567 (N.D. Ill. 1993), the trial court explained how the expert testimony of a plaintiff was insufficient under *Daubert* to support a design defect claim:

5

> *Daubert* teaches that I must consider certain factors ... [the] most important factor is whether the technique (or theory) being advanced by the expert can be or has been tested. The answer here is that it can be and, to some extent, was, and it failed. Clark offered no testable design to support his concept. And the history of engineering and science is filled with finely conceived ideas that are unworkable in practice. There is a high potential rate of error for mathematical concepts offered by engineering analysis.

Numerous other cases have found the lack of reliable testing or trustworthy empirical data to support an expert's defective design contentions as fatal to the admissibility of the proffered testimony. See, e.g., Cabrera v. Cordis Corp., 134 F.3d 1418 (9th Cir. 1998) (lack of testing, research and peer-reviewed articles rendered design defect opinions as not sufficiently reliable for admission under Daubert); Taylor v. Cooper Tire & Rubber Co., 130 F.3d 1395 (10th Cir. 1997) (witness not qualified in products liability case concerning allegedly defective tire due to lack of testing); Shreve v. Sears, Roebuck and Co., 166 F.Supp. 378, 394-403 (D.Md. 2001) (expert opinion regarding alleged defects in snow thrower lacked empirical scientific basis or testing); Bennett v. P.R.C. Public Sector, Inc., 931 F. Supp. 484 (S.D. Tex. 1996) (expert's opinion concerning design of work station was inadmissible as lacking empirical foundation); Dennis v. Pertek Computer Corp., 927 F. Supp. 156 (D. N. J. 1996), aff'd. 135 F.3d 764 (1997) (expert with engineering degree in ergonomics could not testify in products liability action since he failed to enunciate his research technique and his unrecorded mental methodology was speculation); Navarro v. Fuji Heavy Industries,

Ltd., 925 F. Supp. 1323 (N.D. Ill. 1996), aff'd. 117 F.3d 1027 (1997), cert. denied 118 S. Ct. 600 (1997) (engineering expert's conclusions as to cause of failure of vehicle's suspension system was not supported by reliable empirical records and testing methods).

In short, Dr. Balser has constructed a hypothesis but has never tested that hypothesis, despite the fact that his theory is capable of being tested. He has never seen or replicated the conditions which he alleges are responsible for the ladder failure in this case. The only scientific data he offers to support his theory is an incorrect interpretation of testing conducted by Krause, as the manufacturer.

## II. Vibration testing conducted by Krause on Multimatic ladders with zinc locking bolts refutes Dr. Balser's theory of disengagement.

The sole empirical scientific evidence relied upon by Dr. Balser in support of his disengagement theory is the result of "shake tests" conducted by Krause upon Multimatic ladders with zinc locking bolts. Dr. Balser erroneously concludes that: "This testing by the manufacturer is a field validation of the forces which caused the collapse of the ladder in this case." See Exhibit 7 to Plaintiffs' Memorandum at 4.

There is no testing by Krause that in any form or fashion supports the proposition that zinc locking bolts in Multimatic ladders could, or ever did, disengage resulting in ladder collapse. The June 1998 recall was prompted by Krause's discovery that there was a potential for such disengagement with steel locking bolts in certain Multimatic ladders. Out of an abundance of caution, Krause undertook "shake tests" to confirm that the problem identified for purposes of the recall ladders did not extend to Krause ladders with the zinc locking bolts. The results of this testing are summarized in "Tab 4J"

7

(attached hereto as Exhibit B), which was included in the Full Report of Krause, Inc. pursuant to Section 15(b) of the Consumer Products Safety Act. The Full Report was submitted to the CPSC on June 8, 1998. See Affidavit of Edward Hansen dated December 22, 2006 (attached hereto as Exhibit C).

Krause subjected Multimatic ladders with zinc locking bolts to Vibration Cycle Tests, commonly referred to as "shake tests." Exhibit C at 2. At no time did any of these "shake tests" result in disengagement of the zinc locking bolts causing the ladder to collapse. Id. In two of the "shake tests," the engineer who conducted the testing noted a tiny amount of disengagement ranging from one to two millimeters during the first half of the test period. Id. However, the "shake tests" were completed without any additional hinge disengagement or with any failure of the ladders. Id. The tiny disengagement noticed represented a total of 10% to 20% of the disengagement necessary to induce a hinge failure. Id. at 2. This tiny disengagement occurred during the simulation, through shaking, of repeated climbing and walking on the ladder by a user for a minimum period of one hour. See Exhibit B at 1 and Exhibit C at 2.

These "shake tests" confirmed to Krause that the potential hazard identified with respect to the ladders with the steel locking bolts was not present in the ladders with the zinc locking bolts. Exhibit C at 2-3. The results of this testing were submitted to the CPSC, and at no time did that Commission voice disagreement with Krause's conclusions. Id. Nor did the Commission ever recommend the recall of Krause ladders with zinc locking bolts. Id. at 3.

Thus, Krause tested to determine whether there was a potential hazard of disengagement presented by ladders with zinc locking bolts. The testing confirmed that

there was no such potential hazard, and the results were submitted to the CPSC. Dr. Balser has never replicated, observed or even tested for the disengagement that he claims plagued Krause Multimatic ladders. He has no empirical scientific evidence to support his theory and solely relies upon a misinterpretation of the results of the "shake tests" conducted by the manufacturer.

### III.  CONCLUSION

Dr. Balser has no particular expertise in the design, manufacture or safety of ladders. His knowledge concerning articulating ladders, such as that owned by Plaintiffs, is derived as an advocate for individual claimants in product liability claims brought against ladder manufacturers, including in particular Krause. Simply because Dr. Balser may sincerely believe that Krause articulating ladders, regardless of whether or not they have steel locking bolts, are defective in design due to the alleged potential for disengagement of the locking bolts during normal use does not mean his opinions should be admissible. This is particularly true since Dr. Balser has conducted no testing in an attempt to validate his disengagement theory with respect to ladders with zinc locking bolts. Accordingly, this Court should exclude any opinions by Dr. Balser regarding his theory of locking bolt disengagement as a cause of Mr. Mirchandani's accident.

Respectfully submitted,

/s/ Jack L. Harvey_____
Jack L. Harvey
Wharton Levin Ehrmantraut & Klein, P.A.
104 West Street, P. O. Box 551
Annapolis, MD 21404-0551
(410) 263-5900
*Counsel for Defendants Krause, Inc. and Home Depot, U.S.A., Inc.*

9

Certificate of Service

I hereby certify that on the 4th day of January, 2007, a copy of the foregoing was served via electronic mail to the following:

James H. Furman, Esquire
Byrd, Davis, Eisenberg, Walter & Furman
707 West 34th Street
Austin, TX 78705

Brian D. Hill, Esquire
Hill and Ponton, P.A.
915 N. Nova Road
Holly Hill, FL 32117

Hilary J. Ruley, Esquire
Rosenberg, Martin, Funk, Greenberg, LLP
25 South Charles Street, Suite 2115
Baltimore, MD 21201

_____/s/_____
Jack L. Harvey

::ODMA\GRPWISE\ANNAPOLIS.ANNA.WLEKNLIB:202258.1